MICHAEL R.W. HOUSTON
CITY ATTORNEY
MOSES W. JOHNSON, IV
E-mail: mjohnson@anaheim.net
200 S. Anaheim Boulevard, Suite 356
Anaheim, California 92805
Tel: (714) 765-5169 Fax: (714) 765-5123

Attorneys for Defendants CITY OF
ANAHEIM, and CITY OF ANAHEIM
erroneously sued as ANAHEIM POLICE
DEPARTMENT and DAVID GARCIA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA PADILLA AND MARIO CEJA, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF ANAHEIM, ANAHEIM POLICE DEPARTMENT, AND DOE OFFICERS OF THE ANAHEIM POLICE DEPARTMENT, AND DOES 1 through 10, Inclusive,, <br><br> Defendants. | Case No.:   SACV12-622 JVS(JPRx) <br><br> **DEFENDANTS' SEPARATE STATEMENT OF UNCONTROVERTED MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT** <br><br> DATE:        August 5, 2013 <br> TIME:         1:30 p.m. <br> CTRM:       10C <br><br> MOTION HRG. CUTOFF:     7/8/13 <br> TRIAL DATE:                      9/24/13 |

Pursuant to Local Rule 56-1, Defendants CITY OF ANAHEIM, and CITY OF ANAHEIM erroneously sued as ANAHEIM POLICE DEPARTMENT and DAVID GARCIA ("Defendants") submit their proposed "Separate Statement of Uncontroverted Facts and Conclusions of Law" and Judgment in support of their motion for summary judgment.

After consideration of the papers in support of and in opposition to the motion for summary judgment/partial summary judgment of Defendants CITY OF ANAHEIM, and CITY OF ANAHEIM erroneously sued as ANAHEIM

POLICE DEPARTMENT and DAVID GARCIA, together with the argument of counsel, the Court determines that the following facts have been established:

## UNCONTROVERTED FACTS

1.     On November 4, 2011, at 11:54 am, APD Officer DAVID GARCIA was assigned as a single-man patrol officer.  Officer GARCIA was driving his marked patrol unit westbound on Ball Rd., west of Belhaven St.  This area is known to have problems with gangs and drug trafficking.  Officer GARCIA observed 3 males, including MARCEL CEJA, walking west on the north sidewalk, also west of Belhaven St.  They were wearing baggy sweatshirts with their hoods pulled over their heads.  Officer GARCIA made eye contact with 1 of the males, but continued driving west on Ball Rd. Declaration of David Garcia ("Garcia Dec."), ¶ 3.

2.     As Officer GARCIA drove by, he decided to make contact with the 3 males.  He drove around the block by turning north on State College Blvd., turned east on Almont Ave., and turned south on Belhaven.  When he returned to Ball Rd., he looked westbound but did not observe the males.  He looked eastbound and observed 3 males, later identified as EDWIN SALINAS, JOSE GONZALEZ and MARCEL LUIS CEJA, walking east on the north sidewalk of Ball Rd., east of Belhaven.  They had changed direction.  Officer GARCIA believed SALINAS, GONZALEZ and CEJA were the same males he had originally observed walking west on Ball Rd., and that they had changed direction to avoid contact with him.  Garcia Dec., ¶ 4.

3.     Officer GARCIA drove eastbound in the westbound lanes of Ball Rd. and parked along the north curb in the 2300 block of E. Ball Rd.  He parked west of the alley, located on the west side of the Casa Madrid Apartment complex, located at 2301 E. Ball Rd.  He grabbed his baton, which was wedged between the center console and driver's seat, and exited his patrol car.  Garcia Dec., ¶ 5.

4.     SHELLY SORENSON, a local resident, was trying to turn into the west alley of the Casa Madrid Apartments (Declaration of Moses W. Johnson, IV; Exhibit A [Deposition of Shelly Sorenson ("Sorenson Depo.") 26:11-15]), but had to wait for CEJA and his 2 companions GONZALEZ and SALINAS to cross the driveway before commencing her turn into the alley.  Sorenson Depo., 27:17-22.  She observed a police car stopped along the north curb, west of the alley.  CEJA and his companions GONZALEZ and SALINAS looked westbound toward the police car; however, they continued walking eastbound. Sorenson Depo., 27:23-28:3.

5.     Officer GARCIA, wearing an APD police uniform, walked toward CEJA and his companions GONZALEZ and SALINAS.  Garcia Dec., ¶ 6.

6.     CEJA, GONZALEZ and SALINAS looked at Officer GARCIA and were 10 to 12 feet east of him.  Officer GARCIA said, "Hi, do you mind if I talk to you for a second?"  CEJA turned and walked toward him as the other 2, GONZALEZ and SALINAS, continued walking east.  Officer GARCIA observed a large tattoo on the front of CEJA's neck, and based on the tattoo, neighborhood and CEJA's manner of dress, he believed CEJA may be a gang member.  Garcia Dec., ¶ 7.

7.     Officer GARCIA focused his attention toward CEJA's 2 companions, GONZALEZ and SALINAS.  Then, when CEJA was 5 to 7 feet away from Officer GARCIA, CEJA turned to the other 2, and then CEJA ran away east along the north sidewalk.  Officer GARCIA noticed CEJA had put his right hand inside his right sweatshirt pocket as he chased after CEJA.  Officer GARCIA yelled, "Stop, police."  Officer GARCIA advised dispatch, via his police radio, that he was in a foot pursuit.  CEJA ran eastbound, past GONZALEZ and SALINAS, and into the westbound traffic lanes.  Garcia Dec., ¶ 8.

8.     CEJA ran onto the north sidewalk and into the Casa Madrid

3

Apartment Complex parking lot/carport area.  CEJA looped back westbound, and

during the chase Officer GARCIA was 7 to 10 feet behind CEJA.  Garcia Dec.,

¶ 9.

9.     As CEJA continued running west, CEJA removed his right hand

from his sweatshirt pocket, which was holding a chrome handgun.  Officer

GARCIA yelled at CEJA to get down on the ground; however, CEJA continued

running west on the grass north of the sidewalk.  Garcia Dec., ¶ 10.

10.     Officer GARCIA observed CEJA stumble forward onto the grass,

the handgun flew from CEJA's hand and tumbled into the shrubbery, a couple

feet away from CEJA.  Officer GARCIA stopped and was standing 4 to 5 feet

away from CEJA, who was on the ground.  CEJA assumed a seated position,

turned toward Officer GARCIA, and CEJA put his left hand into his sweatshirt

pocket.  Garcia Dec., ¶ 11.

11.     JAMES CLEMENTS was driving westbound on Ball Rd. and saw

Officer GARCIA chasing CEJA.  Declaration of Moses W. Johnson, IV; Exhibit

B [Deposition of James Clements ("Clements Depo.") 21:25-23:9].  He looked

back over his right shoulder in the "three o'clock" position, and he observed

Officer GARCIA to be verbalizing orders to CEJA. Clements Depo., 25:7-12.

He observed CEJA fall onto a sloped grassy area.  Clements Depo., 23:15-20.

He observed Officer GARCIA pointing his gun at CEJA as he was seated on the

grass.  Clements Depo., 24:2-13 and 24:20-25.  CEJA's right hand was

completely in his right front shorts pocket.  He thought CEJA was trying to get

something out of his pocket but it wouldn't come out.  Clements Depo., 36:8-14.

He could not hear what was being said because the car windows were rolled up

as he was driving by, but he observed the Officer's lips moving while his gun

was pointed at CEJA.  Clements Depo., 36:18-37:6.  CEJA appeared to be

uncooperative and angry as he was moving around, looking around, and yelling

something at Officer GARCIA.  Clements Depo., 25:13-17.  CLEMENTS

4

1  temporarily lost sight of them because an electrical box blocked his view as he
2  drove by. During that time, he heard 2 shots. Clements Depo., 37:7-16. He
3  looked at his watch and it was 11:55 am. Clements Depo., 27:14-18.
4  CLEMENTS had observed CEJA's right hand deep inside his right, front shorts
5  pocket, moving around as if he was attempting to remove an object from the
6  pocket. Clements Depo., 25:18-25.

7      12.    DIANE SILVA, a resident in the area, was at home sitting on her
8  living room couch when she heard yelling outside. She heard 2 different voices
9  involved, and she described the yelling as "Intense." SILVA walked toward the
10  sliding glass door, located on the south wall of the apartment, which faced Ball
11  Rd. Declaration of Moses W. Johnson, IV; Exhibit C [Deposition of Diane
12  Jackson Silva ("Silva Depo.") 23:1-15]

13      13.    SILVA observed Officer GARCIA, with his weapon drawn,
14  walking diagonally in a northwest direction. Silva Depo., 24:12-20. From her
15  vantage point, she could see Officer GARCIA, but not CEJA. Officer GARCIA
16  stepped onto the grass between the curb and the sidewalk. Officer GARCIA
17  continued walking and pointing his weapon in a northwest direction, but due to
18  her obstructed view, SILVA was unable to see who Officer GARCIA was
19  pointing his weapon at. Silva Depo., 25:1-19.

20      14.    Officer GARCIA was yelling commands the entire time, "Stop,"
21  and something to the effect of, "Get your hands out of your pockets," or "Don't
22  put your hands in your pockets." SILVA did not understand what was being said
23  by CEJA, but his voice was loud and she believed he was shouting obscenities.
24  Silva Depo., 25:20-26:11. SILVA heard Officer GARCIA yell commands at
25  CEJA at least 3 times to remove his hands from his pocket before she heard shots
26  fired. Silva Depo., 26:25-27:19.

27      15.    SILVA observed Officer GARCIA step onto the sidewalk from the
28  grass, and he continued to walk in a northwest direction. SILVA heard what she

1  believed to be Officer GARCIA's commands for the 3rd time prior to the

2  shooting.  Silva Depo., 27:8-19.

3      16.    Officer GARCIA ordered CEJA to show him his hands; however, it

4  appeared to Officer GARCIA that CEJA was manipulating a 2nd handgun in his

5  sweatshirt pocket.  Officer GARCIA feared that it was a 2nd handgun.  Officer

6  GARCIA ordered CEJA 3 times to show him his hands.  CEJA did not comply.

7  Officer GARCIA was in fear that CEJA would shoot him though the sweatshirt

8  without even removing the handgun from his pocket.  Fearing for his life and due

9  to CEJA ignoring his commands and manipulating his concealed hand within his

10  sweatshirt, GARCIA fired 2 rounds, striking CEJA.  Garcia Dec., ¶ 15.

11

12      Based on the foregoing Uncontroverted Facts, the Court now makes its

13  Conclusions of Law as follows:

14  **CONCLUSIONS OF LAW**

15      1.    A motion for summary judgment must be granted if the moving

16  party demonstrates that "there is no genuine issue as to any material fact and that

17  the moving party is entitled to a judgment as a matter of law."  FRCP 56(c)-(d).

18      2.    Claims which allege that law enforcement officers have used

19  excessive force in the course of a "seizure" are analyzed under the 4th

20  Amendment and its "reasonableness" standard.  Graham v. Conner (1989) 490

21  US 386, 395-397.

22      3.    The reasonableness of a particular use of force must be judged from

23  the perspective of a reasonable officer on the scene, rather than with the 20/20

24  vision of hindsight.  The calculus of reasonableness must embody an allowance

25  for the fact that police officers are often forced to make split second judgments-

26  in circumstances that are tense, uncertain, and rapidly evolving-about the amount

27  of force that is necessary in a particular situation.  Graham, supra, 490 US at 396-

28  397.

4.      The factors considered in determining the reasonableness of the officer's conduct are: (1) the severity of the underlying offense; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest.  Graham, supra, 490 US at 396.

5.      Police stops are legal so long as officers reasonably suspect a violation has occurred.  United States v. Ramirez (9th Cir. 2007) 473 F.3d 1026, 1038.

6.      Plaintiff cannot recover under the 4th Amendment arising from the instant shooting because the police officer involved had reasonable cause to believe that plaintiff posed a threat of death or serious bodily injury to the officer(s).  Tennessee v. Garner (1985) 471 US 1, 11-12.

7.      A police officer may not be held liable for his defensive use of deadly force unless the provocation was itself was an independent Fourth Amendment violation.  Billington v. Smith (9th Cir. 2002) 292 F.3d 1177, 1189.

8.      A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable.  Scott v. Henrich, (9th Cir. 1994) 39 F.3d 912, 915.

9.      For a civil rights violation to exist, more than mere negligence must be proved.  Daniels v. Williams (1986) 474 US 327, 328.

10.     The officer's action in shooting Ceja was reasonable under the circumstances.  Ceja repeatedly reached into his pocket despite the officer's orders to show his hands, leading the officer to believe that Ceja was attempting to reach for a gun to shoot at Officer GARCIA resulting in death or serious injury.

11.     To recover under his 14th Amendment substantive due process claim, the plaintiff must show that the officer's use of force "shocks the conscience."  County of Sacramento v. Lewis (1998) 523 US 833, 846.

12.     When an officer is faced with a fast paced, evolving situation with

7

1   insufficient time for deliberation, his conduct "shocks the conscience" when he

2   acts with a purpose to harm that is unrelated to legitimate law enforcement

3   objectives. Porter v. Osborn (9th Cir. 2008) 546 F3d 1131, 1137-1140.

4        13.   In a rapidly evolving, fluid and dangerous predicament which

5   precludes the luxury of calm and reflective pre-response deliberation, a police

6   officer's actions "shock the conscience" only if they involved force employed

7   "maliciously and sadistically for the very purpose of causing harm." Claybrook

8   v. Birchwell (6th Cir. 2000) 199 F.3d 350, 359 quoting Lewis, supra, 118 S.Ct. at

9   1720.

10       14.   The officer's shooting of Ceja did not violate his substantive due

11   process rights because he was responding to an imminent threat posed by Ceja,

12   and he did not intend to commit any harm unrelated to the legitimate use of force

13   necessary to protect himself.

14       15.   A public entity can only be held liable for a civil rights violation if

15   an unconstitutional policy, practice or custom of the public entity was the cause

16   in fact of a constitutional deprivation. Monell v. Department of Social Services

17   (1978) 436 US 658, 690-692.

18       16.   It is not enough for Plaintiff merely to identify conduct properly

19   attributable to the local government as "policy" or "conduct." Plaintiff must

20   prove that: (1) the City's actions were taken with the requisite degree of

21   culpability, i.e., deliberate indifference; and (2) there is a direct causal link

22   between the City's action, policy or custom and the alleged deprivation of a

23   federal right. Bryan County Commissioners Court, supra, 520 US at 404.

24       17.   Plaintiff has failed to establish that the City of Anaheim maintained

25   an unconstitutional policy, practice or custom which was the cause in fact of a

26   violation of constitutional rights.

27       18.   Defendants City of Anaheim and Officer GARCIA are entitled to

28   partial summary judgment against Plaintiff on his claim for violation of civil

1  rights under the 4th Amendment.

2       19.   Defendants City of Anaheim and Officers GARCIA are entitled to

3  partial summary judgment against Plaintiff on their claim for violation of civil

4  rights under the 14th Amendment.

5       20.   Defendants City of Anaheim and Officers GARCIA, are entitled to

6  partial summary judgment against Plaintiff on his claim for municipal liability.

7       21.   Defendants City of Anaheim and Officers GARCIA are entitled to

8  summary judgment against Plaintiff on all his claims, including their state

9  claims.

10       Judgment should be entered in Defendants' favor forthwith.

11

12  Dated: _____

13                              By: _____
                                    Honorable James V. Selna
14                                  United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28  <unsaved>