1  **SAYRE & LEVITT, LLP**
   Federico Castelan Sayre, Esq., (SBN: 067420)
2  sayreesq@sayrelevitt.com
   Adam L. Salamoff, Esq., (SBN: 193686)
3  asalamoff@sayrelevitt.com
4  333 Civic Center Drive West
   Santa Ana, CA  92701
5  T: (714) 550-9117 / F: (714) 716-8445
6
7  Attorneys for Plaintiff, BARBARA PADILLA and MARIO CEJA

8              **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11 BARBARA PADILLA and MARIO          )  **CASE NO. SACV12-622 JVS (JPRx)**
   CEJA,                              )
12                                    )  Judge James V. Selna
                                      )
13          Plaintiffs,               )  **PLAINTIFFS' RESPONSE TO**
                                      )  **DEFENDANTS' STATEMENT OF**
14 v.                                 )  **UNDISPUTED FACTS AND**
                                      )  **PLAINTIFFS' SEPARATE**
15                                    )  **STATEMENT OF DISPUTED**
   CITY OF ANAHEIM, ANAHEIM           )  **MATERIAL FACTS**
16 POLICE DEPARTMENT, AND DOE         )
   OFFICERS OF THE ANAHEIM POLICE     )  *[Filed Concurrently Herewith:*
17 DEPARTMENT, and DOES 1 through     )  *  1) Plaintiffs' Opposition to Defendants' Motion*
   100, Inclusive,                    )  *     for Summary Judgment and/or Partial*
18                                    )  *     Summary Judgment; Memorandum of Points*
                                      )  *     and Authorities; and*
19          Defendants.               )  *  2) Declaration of Federico C. Sayre, Esq. in*
                                      )  *     Support of Plaintiffs' Opposition to*
20                                    )  *     Defendants' Motion for Summary Judgment*
                                      )  *     and/or Partial Summary Judgment]*
21                                    )
22 _____

23       Plaintiffs, BARBARA PADILLA and MARIO CEJA, submit the following

24 Response to Defendants' Separate Statement of Material Facts in dispute, together with

25 references to supporting evidence, in opposition to Defendant CITY OF ANAHEIM's

26 Separate Statement of Undisputed Material Facts:

27

28
                                      1

| UNDISPUTED MATERIAL FACTS | RESPONSE AND EVIDENCE |
|---|---|
| 1. On November 4, 2011, at 11:54 am, APD Officer DAVID GARCIA was assigned as a single-man patrol officer. Officer DAVID GARCIA was driving his marked patrol unit westbound on Ball Road, west of Belhaven Street. This area is known to have problems with gangs and drug trafficking. Officer GARCIA observed three (3) males, including MARCEL CEJA, walking west on the north sidewalk, also west of Belhaven Street. They were wearing baggy sweatshirts with their hoods pulled over their heads. Officer GARCIA made eye contact with one of the males but continued driving west on Ball Road. Declaration of David Garcia (Garcia Dec."), ¶3. | Undisputed. |
| 2. As Officer GARCIA drove by, he decided to make contact with the three males. He drove around the block by turning north on State College Blvd., turned east on Almont Avenue, and turned south on Belhaven. When he returned to Ball Road, he looked westbound but did not observe the males. He looked eastbound and observed three males, later identified as EDWIN SALINAS, JOSE GONZALEZ and MARCEL LUIS CEJA, walking east on the north sidewalk of Ball Road, east of Belhaven. They had changed direction. Officer GARCIA believed SALINAS, GONZALEZ and CEJA were the same males he had originally observed walking west on Ball Road, and that they had changed direction to avoid | Disputed in part. GARCIA's statement that the three males changed direction to avoid contact with him is objected to on the grounds that it is pure speculation as to the state of mind of the three males. |

2

PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

| | | |
|---|---|---|
| | contact with him. Garcia Dec., ¶4. | |
| 3. | Officer GARCIA drove eastbound in the westbound lanes of Ball Rd. and parked along the north curb in the 2300 block of E. Ball Rd. He parked west of the alley, located at 2301 E. Ball Road. He grabbed his baton, which was wedged between the center console and driver's seat, and exited his patrol car. Garcia Dec., ¶5. | Undisputed. |
| 4. | Shelley Sorenson, a local resident, was trying to turn into the west alley of the Casa Madrid Apartments (Declaration of Moses W. Johnson, IV; Exhibit A [Deposition of Shelley Sorenson (Sorenson Depo.") 26:11-15]), but had to wait for CEJA and his 2 companions, GONZALEZ and SALINAS to cross the driveway before commencing her turn into the alley. Sorenson Depo., 27:17-22. She observed a police car stopped along the north curb, west of the alley. CEJA and his companions, GONZALEZ and SALINAS, looked westbound toward the police car; however, they continued walking eastbound. Sorenson Depo., 27:23-28:3. | Undisputed. |
| 5. | Officer GARCIA, wearing an APD police uniform, walked toward CEJA and his companions, GONZALEZ and SALINAS. Garcia Dec., ¶6. | Undisputed. |
| 6. | CEJA, GONZALEZ and SALINAS looked at Officer GARCIA and were 10 to 12 feet east of him. Officer GARCIA said, "Hi, do you mind if I talk to you for a second?" CEJA turned and walked toward him as the other two, GONZALEZ and SALINAS continued walking east. Officer GARCIA observed a large tattoo on | Disputed in part. Officer GARCIA's statement that based upon CEJA having a large tattoo on his neck, the neighborhood and his manner of dress, that he believed CEJA may be a gang member is objected to as speculative. |

| | | | |
|---|---|---|---|
| | | the front of CEJA's neck, and based on the tattoo, neighborhood and CEJA's manner of dress, he believed CEJA may be a gang member. Garcia Dec., ¶7. | |
| 7. | | Officer GARCIA focused his attention toward CEJA's two companions, GONZALEZ and SALINAS. Then, when CEJA was 5 to 7 feet away from Officer GARCIA, CEJA turned to the other two, and then CEJA ran away east along the north sidewalk. Officer GARCIA noticed CEJA had put his right hand inside his right sweatshirt pocket as he chased after CEJA. Officer GARCIA yelled, "Stop, police." Officer GARCIA advised dispatch, via his police radio, that he was in a foot pursuit. CEJA ran eastbound, past GONZALEZ and SALINAS, and into the westbound traffic lanes. Garcia Dec., ¶8. | Undisputed. |
| 8. | | CEJA ran onto the north sidewalk and into the Casa Madrid Apartment Complex parking lot/carport area. CEJA looped back westbound, and during the chase Officer GARCIA was 7 to 10 feet behind CEJA. Garcia Dec., ¶9. | Undisputed. |
| 9. | | As CEJA continued running west, CEJA removed his right hand from his sweatshirt pocket, which was holding a chrome handgun. Officer GARCIA yelled at CEJA to get down on the ground; however, CEJA continued running west on the grass north of the sidewalk. Garcia Dec., ¶10. | Undisputed. |
| 10. | | Officer GARCIA observed CEJA stumble forward onto the grass, the handgun flew from CEJA's hand and tumbled into the shrubbery, a couple of | Disputed. CEJA's hands were not in his pockets when he was in a seated position facing Officer GARCIA. CEJA's hands were raised and were never in his pockets |

4

feet away from CEJA. Officer GARCIA stopped and was standing 4 to 5 feet away from CEJA, who was on the ground. CEJA assumed a seated position, turned toward Officer GARCIA, and CEJA put his left hand into his sweatshirt pocket. Garcia Dec., ¶11.

before he raised them, when CEJA was seated on the grass facing Officer GARCIA. Depo Transcript of Manuel Alejandro Ramirez Penaloza, pg. 21:3-15 (**Exhibit "1"**). There was a gunshot wound to CEJA's left hand, but no bullet hole at or near either of CEJA's pockets. The two entrance wounds are located at CEJA's right upper chest and left upper abdomen. Orange County Sheriff-Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10 (**Exhibit "2"**). The trajectory of the rounds fired supports the conclusion that CEJA's hands were visible at the time he was shot. Report of Roger Clark, dated 7/7/11, pg. 5 (**Exhibit "3"**). There is no bullet hole near CEJA's pocket. Officer GARCIA shot CEJA while CEJA's empty left hand was outside of his pocket. Report of Marc Firestone, pg. 2 (**Exhibit "4"**). Prior to hearing any gunshots, while seated on the grass, CEJA put his hands up. Orange County District Attorney's Office – Bureau of Investigation, Interview Report of Gabriel Arredondo, dated 9/14/12, pg. 2 (**Exhibit "5"**).

| 11. | James Clements was driving westbound on Ball Road and saw Officer GARCIA chasing CEJA. Declaration of Moses W. Johnson, IV; Exhibit B [Deposition of James Clements ("Clements Depo.") 21:25-23:9]. He looked back over his right shoulder in the "three o'clock" position, and he observed Officer GARCIA to be verbalizing orders to CEJA. Clements Depo., 25:7-12. He observed CEJA fall onto a sloped grass area. Clements Depo., 23:15-20. He observed Officer GARCIA pointing | Disputed. CEJA's hands were not in his pockets when he was in a seated position facing Officer GARCIA. CEJA's hands were raised and were never in his pockets before he raised them, when CEJA was seated on the grass facing Officer GARCIA. Depo Transcript of Manuel Alejandro Ramirez Penaloza, pg. 21:3-15 (**Exhibit "1"**). There was a gunshot wound to CEJA's left hand, but no bullet hole at or near either of CEJA's pockets. The two entrance wounds are located at CEJA's right upper chest and left upper abdomen. Orange County Sheriff- |

| | | |
|---|---|---|
| | his gun at CEJA as he was seated on the grass. Clements Depo., 24:2-13 and 24:20-25. CEJA's right hand was completely in his right front shorts pocket. He thought CEJA was trying to get something out of his pocket but it wouldn't come out. Clements Depo., 36:8-14. He could not hear what was being said because the car windows were rolled up as he was driving by, but he observed the Officer's lips moving while his gun was pointed at CEJA. Clements Depo., 36:18-37:6. CEJA appeared to be uncooperative and angry as he was moving around, looking around, and yelling something at Officer GARCIA. Clements Depo., 25:13-17. Clements temporarily lost sight of them because an electrical box blocked his view as he drove by. During that time, he heard 2 shots. Clements Depo., 37:7-16. He looked at his watch and it was 11:55 am. Clements Depo., 27:14-18. Clements had observed CEJA's right hand deep inside his right front shorts pocket, moving around as it he was attempting to remove an object from the pocket. Clements Depo., 25:18-25. | Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10 (**Exhibit "2"**). The trajectory of the rounds fired supports the conclusion that CEJA's hands were visible at the time he was shot. Report of Roger Clark, dated 7/7/11, pg. 5 (**Exhibit "3"**). There is no bullet hole near CEJA's pocket. Officer GARCIA shot CEJA while CEJA's empty left hand was outside of his pocket. Report of Marc Firestone, pg. 2 (**Exhibit "4"**). Prior to hearing any gunshots, while seated on the grass, CEJA put his hands up. Orange County District Attorney's Office – Bureau of Investigation, Interview Report of Gabriel Arredondo, dated 9/14/12, pg. 2 (**Exhibit "5"**). |
| 12. | Diane Silva, a resident in the area, was at home sitting on her living room couch when she heard yelling outside. She heard 2 different voices involved, and she described the yelling as "Intense." Silva walked toward the sliding glass door, located on the south wall of the apartment, which faced Ball Road. Declaration of Moses W. Johnson, IV; Exhibit C [Deposition of Diane Jackson Silva ("Silva Depo.") 23:1-15] | Undisputed. |

6

| | | | |
|---|---|---|---|
| 1 | 13. | Silva observed Officer GARCIA, with his weapon drawn, walking diagonally in a northwest direction. Silva Depo., 24:12-20. From her vantage point, she could see Officer GARCIA, but not CEJA. Officer GARCIA stepped onto the grass between the curb and the sidewalk. Officer GARCIA continued walking and pointing his weapon in a northwest direction, but due to her obstructed view, Silva was unable to see who Officer GARCIA was pointing his weapon at. Silva Depo., 25:1-19. | Undisputed. |
| | 14. | Officer GARCIA was yelling commands the entire time, "Stop," and something to the effect of, "Get your hands out of your pockets," or "Don't put your hands in your pockets." Silva did not understand what was being said by CEJA, but his voice was loud and she believed he was shouting obscenities. Silva Depo., 25:20-26:11. Silva heard Officer GARCIA yell commands at CEJA at least 3 times to remove his hands from his pocket before she heard shots fired. Silva Depo., 26:25-27:19. | Disputed. CEJA's hands were not in his pockets when he was in a seated position facing Officer GARCIA. CEJA'S hands were raised and were never in his pockets before he raised them, when CEJA was seated on the grass facing Officer GARCIA. Depo Transcript of Manuel Alejandro Ramirez Penaloza, pg. 21:3-15 (**Exhibit "1"**).   There was a gunshot wound to CEJA'S left hand, but no bullet hole at or near either of CEJA'S pockets. The two entrance wounds are located at CEJA's right upper chest and left upper abdomen.   Orange County Sheriff-Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10 (**Exhibit "2"**).   The trajectory of the rounds fired supports the conclusion that CEJA's hands were visible at the time he was shot. Report of Roger Clark, dated 7/7/11, pg. 5 (**Exhibit "3"**). There is no bullet hole near CEJA's pocket.   Officer GARCIA shot CEJA while CEJA's empty left hand was outside of his pocket.  Report of Marc Firestone, pg. 2 (**Exhibit "4"**).  Prior to hearing any gunshots, while seated on the grass, CEJA put his hands up.  Orange County District |

PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

| | | | |
|---|---|---|---|
| | | | Attorney's Office – Bureau of Investigation, Interview Report of Gabriel Arredondo, dated 9/14/12, pg. 2 (**Exhibit "5"**). |
| 15. | Silva observed Officer GARCIA step onto the sidewalk from the grass, and he continued to walk in a northwest direction. Silva heard what she believed to be Officer GARCIA's commands for the 3rd time prior to the shooting. Silva Depo., 27:8-19. | Undisputed. | |
| 16. | Officer GARCIA ordered CEJA to show him his hands; however, it appeared to Officer GARCIA that CEJA was manipulating a 2nd handgun in his sweatshirt pocket. Officer GARCIA feared that it was a 2nd handgun. Officer GARCIA ordered CEJA 3 times to show him his hands. CEJA did not comply. Officer GARCIA was in fear that CEJA would shoot him through the sweatshirt without even removing the handgun from his pocket. Fearing for his life and due to CEJA ignoring his commands and manipulating his concealed hand within his sweatshirt, GARCIA fired 2 rounds, striking CEJA. Garcia Dec., ¶ 15. | Disputed. CEJA's hands were not in his pockets when he was in a seated position facing Officer GARCIA. CEJA's hands were raised and were never in his pockets before he raised them, when CEJA was seated on the grass facing Officer GARCIA. Depo Transcript of Manuel Alejandro Ramirez Penaloza, pg. 21:3-15 (**Exhibit "1"**). There was a gunshot wound to CEJA's left hand, but no bullet hole at or near either of CEJA's pockets. The two entrance wounds are located at CEJA's right upper chest and left upper abdomen. Orange County Sheriff-Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10 (**Exhibit "2"**). The trajectory of the rounds fired supports the conclusion that CEJA's hands were visible at the time he was shot. Report of Roger Clark, dated 7/7/11, pg. 5 (**Exhibit "3"**). There is no bullet hole near CEJA's pocket. Officer GARCIA shot CEJA while CEJA's empty left hand was outside of his pocket. Report of Marc Firestone, pg. 2 (**Exhibit "4"**). Prior to hearing any gunshots, while seated on the grass, CEJA put his hands up. Orange County District Attorney's Office – Bureau of Investigation, Interview Report of Gabriel | |

PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

| | Arredondo, dated 9/14/12, pg. 2 (**Exhibit "5"**). |
|---|---|

## PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED MATERIAL FACTS

| PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS ("PMF") | DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT |
|---|---|
| 1. For the purposes of opposing this motion only, Plaintiffs will accept Defendants' facts up to the point that the CEJA fell on the grassy area where the shooting eventually occurred. | |
| 2. When CEJA was sitting on the grass, Officer GARCIA instructed him to raise his hands and in response, CEJA raised his hands. (Deposition of Manuel Alejandro Ramirez Penaloza, pg. 19:9-11, attached as **Exhibit "1"**). | |
| 3. When CEJA was sitting facing the Officer, before he raised his hands, neither of his hands were in his pockets. (Deposition of Manuel Alejandro Ramirez Penaloza, pg. 21:3-12, attached as **Exhibit "1"**). | |
| 4. While CEJA was in a seated position on the grass, CEJA put his hands up; and at that time, Officer GARCIA was pointing his handgun directly at CEJA. (Interview Report of Gabriel Arredondo, dated 9/4/12, given to the Orange County District Attorney's Office, attached as **Exhibit "5"**; Deposition of Gabriel Arredondo, taken on 6/26/13 – transcript not yet received. See Declaration of Federico C. Sayre, Esq.; See Declaration of James Clark aka James Weathersby, taken on July 9, 2013 – transcript not | |

9

| | | |
|---|---|---|
| | | yet received.   See Declaration of Federico C. Sayre, Esq.). | |
| 5. | At the time that Officer GARCIA fired his two rounds at CEJA, CEJA's hands were raised, not in his pockets. (Depo of Manuel Alejandro Ramirez Penaloza, pg. 19:9-24, 20:2-5, 21-24, attached as **Exhibit "1"**.  See Declaration of James Clark a/k/a James Weathersby, taken on July 9, 2013 – transcript not yet received.   See Declaration of Federico C. Sayre, Esq.). | |
| 6. | There was a gunshot wound to CEJA's left hand, but no bullet hole at or near either of CEJA's pockets.   The two entrance wounds are located at CEJA's right upper chest and left upper abdomen.   (Orange County Sheriff-Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10, attached as **Exhibit "2"**). | |
| 7. | The trajectory of the rounds fired supports the conclusion that CEJA's hands were visible at the time he was shot by Officer GARCIA and that CEJA was unarmed and made no threats when Officer GARCIA fired his shots. (Report of Roger Clark, dated 7/7/11, pg. 5, attached as **Exhibit "3"**). | |
| 8. | Officer GARCIA's version of the shooting requires that there be a bullet hole in the left pocket of CEJA's sweatshirt, however there is no bullet hole, or defect any kind in this pocket. (Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**). | |
| 9. | There was no hole or defect in CEJA's right pocket. (Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**). | |

10

| | | |
|---|---|---|
| 10. | The physical evidence leads to the conclusion that Officer GARCIA purposely shot CEJA twice, while CEJA's empty left hand was in front of his chest. (Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**). | |
| 11. | The empty hand would have been perfectly visible to Officer GARCIA. Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**). | |
| 12. | Officer GARCIA's statements and testimony are so at variance with the physical evidence that one has to conclude Officer GARCIA purposely lied about the facts of this shooting incident. (Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**). | |
| 13. | The Orange County Coroner Autopsy Report identifies 'Gunshot C' through CEJA's left hand. (Report of Marc Firestone, pg. 2, attached as **Exhibit "4"**); Orange County Sheriff-Coroner Autopsy Report, dated 11/7/11, pg. 3-4, 8-10, attached as **Exhibit "2"**). | |
| 14. | The physical bullet trajectory (the through and through wound in CEJA's left hand) documents that CEJA's hand was not inside his sweatshirt pocket as alleged. (Report of Roger Clark, dated 7/7/11, pg. 5, attached as **Exhibit "3"**). | |
| 15. | Therefore, Officer GARCIA should not have fired his weapon, because he was not confronted with an 'immediate defense of life' situation. (Report of Roger Clark, dated 7/7/11, pg. 5, attached as **Exhibit "3"**). | |
| 16. | When Officer GARCIA engaged in a solo foot pursuit, he did not follow the tactical guidelines required of every Basic POST certified law enforcement officer in this incident. (Report of | |

11

| | | | |
|---|---|---|---|
| 1 | | Roger Clark, dated 7/7/11, pg. 5, attached as **Exhibit "3"**). | |
| 2<br>3<br>4<br>5<br>6<br>7 | 17. | Officer GARCIA had various less-than-lethal and/or non-force options available to him, including using his radio and calling in back-up units and set up containment and a perimeter to apprehend CEJA without the use of lethal force.  (Report of Roger Clark, dated 7/7/11, pg. 5, attached as **Exhibit "3"**). | |

8

9   DATED: July 15, 2013                **SAYRE & LEVITT, LLP**

10

11

12                        By: _____

13                             Federico C. Sayre

14                             Adam L. Salamoff

15                             Attorneys for Plaintiffs

16                             BARBARA PADILLA AND MARIO CEJA

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


BARBARA PADILLA and MARIO     )
CEJA,                         )
                              )
            Plaintiffs,       )
                              )
      vs.                     )   No. SACV12-622 JVS
                              )
CITY OF ANAHEIM; ANAHEIM      )
POLICE DEPARTMENT, and DOE    )
OFFICES OF THE ANAHEIM POLICE )
DEPARTMENT; and DOES 1        )
through 100, inclusive,       )
                              )
            Defendants.       )
_____)


VIDEOTAPED DEPOSITION OF

MANUEL ALEJANDRO RAMIREZ PEÑALOZA

Santa Ana, California

Wednesday, January 30, 2013


Reported by:
JODI MONROE, RPR, CLR
CSR No. 13010
JOB No. 4568F

EXHIBIT

1

1      have you been in the United States?

2           A    (In English.)  Ten years already in English.

3           Q    And when you speak to your customers, when

4      you're doing air conditioning for them, do you speak to

10:28  5      them in English or Spanish?

6           A    (In English.)  In English.

7           Q    Okay.  Let's continue in Spanish, but I wanted

8      just to see --

9           Okay.  All right.  So when the officer said,

10:28 10     "Raise your hands," what did the young man do?

11          A    He had them up.  He raised them.

12          Q    When you said, "He raised them," where did --

13     where -- how -- what height did he raise them to?

14          A    Normal.  He kept his hands up like this

10:28 15     (indicating).

16          Q    Okay.  You -- you indicated putting them above

17     his head?

18          A    He didn't place them, because as soon as he put

19     his hands up the officer -- it didn't take even two

10:29 20     seconds and he shot him.  He shot at him.

21          Q    Okay.  So he never actually raised his hands

22     above his head?

23          A    Yes, he raised them.  That's what I'm saying.

24     He raised his hands.  His hands were up.

10:29 25     Q    Okay.  But he was starting to raise his hands?

1       A     No, they were already.

2       Q     Okay.  When the officer fired, do you remember

3    whether or not where his hands were?

4       A     They were raised, but with the shots the boy

10:29  5   fell with his face down.

6       Q     Okay.  Did he fall towards the officer?

7       A     No.

8       Q     Which way did he fall?

9       A     He was sitting -- he was sitting down and he

10:30 10   received the shots.  The boy, he just went like this

11   (indicating), and then he was -- his body was, like,

12   stretch, laying, and the officer was -- and he was

13   laying facing the other way.

14      Q     Okay.  You seem to suggest by what you're

10:30 15   saying is that after he was shot he sort of turned to

16   one side; is that correct?

17      A     Yes.

18      Q     All right.  And he fell face down away from the

19   officer?

10:30 20      A     Yes.

21      Q     When the shooting took place, can you tell with

22   certainty how high his hands were?

23      A     Well, it would be -- it would be like I said,

24   his hands were already raised.

10:31 25      Q     Okay.  Now, do you remember that as he was

                                                                                20

Barbara Padilla  vs. City of Anaheim                                    Date Taken:  1/30/2013
Witness:  Manuel Alejandro  Ramirez Penaloza

```
 1    raising his hands the shooting occurred?
 2         A    No.
 3         Q    Okay.  When he was sitting facing the officer
 4    what -- where were his knees?
 5         A    They were like this (indicating), like -- like
 6    when you're sitting down normally.
 7         Q    Were they sort of propped up in front of him?
 8         A    A little bit.
 9         Q    Okay.  Did you see at any time the young man,
10    before he raised his hands, did you see him with his --
11    either hand in a pocket of his sweater or sweatshirt?
12         A    No.
13         Q    Okay.  Did you ever hear the officer tell him
14    to take his hand out of his pocket?
15         A    No.
16         Q    After he fell, up until the time that the
17    shooting took place, how long a period of time passed?
18         A    After -- I'm sorry?
19         Q    After he fell, up until the time the shooting
20    occurred, how much time passed?
21         A    Two seconds, three seconds passed.
22         Q    From the time that the officer said, "Raise
23    your hands," how quickly thereafter did he shoot him?
24         A    About two -- two, three seconds.
25         Q    Okay.  Now, looking at your transcript of your
```

10:31  5
10:31 10
10:32 15
10:32 20
10:33 25

# ORANGE COUNTY SHERIFF-CORONER
## 1071 W. Santa Ana Blvd.
## Santa Ana, CA  92703
### Coroner Division

| | |
|---|---|
| DECEDENT:   CEJA, Marcel Luis | CASE NUMBER: 11-04061-BA |
| AGE: 22 Years          DOB: 6/30/1989          SEX: Male          RACE:  Hispanic | |

**PLACE OF DEATH:**          UCI Medical Center

**DATE/TIME OF DEATH:**     11/04/2011 14:16

**AUTOPSY DATE/TIME:**      11/07/2011  9:18

**PLACE OF AUTOPSY:**       Orange County Coroner Facility
1071 W. Santa Ana Blvd.
Santa Ana, CA  92703

**AUTOPSY ATTENDANTS:**     Richard Gustilo, OCSD
Ryan McNamara, OCSD
Jennifer Jarrett, OCSD
John V. Savino, OCCO
Tom Conklin, OCDA
Andrew Ross, OCDA
Jeff Mundy, APD

**CAUSE OF DEATH:**         Multiple gunshot wounds

**OTHER CONDITIONS:**       None

**MANNER:**                 Homicide

**CERTIFICATE ISSUED:**     11/7/2011

**AMENDMENT:**

Lawrence L. Nguyen, M.D.
Forensic Pathologist

EXHIBIT
2

## ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

CEJA, Marcel Luis

11-04061-BA
Page 2

EXTERNAL EXAMINATION: The body is identified by toe tags and is that of an unembalmed adult Hispanic male who appears about the reported age of 22 years. The body weighs 148 pounds, measures 66 inches, and appears well-developed and well-nourished. Numerous tattoos are present throughout the body. A possible scar is present on the upper abdomen, that is ovoid in shape and measures ¾ x ½ inches. A small area of ecchymosis is present in the right antecubital fossa. Rigor mortis has presumably been altered. Livor mortis is present posteriorly.

The head is normocephalic and covered by black hair. A sparse mustache/goatee is present. Examination of the eyes reveals irides that are brown in color and sclerae that are unremarkable. There are no petechial hemorrhages of the conjunctivae of the lids or the sclerae. Upper and lower teeth are present. The neck is unremarkable.

There is no chest deformity. The abdomen is flat. The genitalia are those of an adult male. The penis appears uncircumcised. The external genitalia are without trauma or lesions. The extremities show no edema, joint deformity, abnormal mobility, or needle tracks.

EVIDENCE OF THERAPEUTIC INTERVENTION: The following are present and are in proper position: endotracheal tube, orogastric tube, EKG pads, urinary catheter, intravenous lines.

There are signs that the following surgical procedures have been done: left-sided thoracotomy, right-sided chest tube placement, laparotomy.

GUNSHOT WOUNDS: The following gunshot wounds have been labeled "A", "B", and "C" arbitrarily. This does not imply an opinion as to the number of shots or to the order in which these wounds were sustained.

11/8/2011  bl (18574)

Lawrence L. Nguyen, M.D., Forensic Pathologist

**ORANGE COUNTY SHERIFF-CORONER
AUTOPSY REPORT**

CEJA, Marcel Luis                                                                  11-04061-BA
                                                                                          Page 3

Gunshot wound "A":
The entrance wound is ovoid and measures ¾ x⅝ inches, with a 1/16 inch circumferential marginal abrasion. The entrance wound is situated at the right upper chest. It is centered 17 inches from the vertex and 1 inch to the right of midline. There is no soot or stippling.

There is no exit wound.

The projectile was recovered from within the right chest cavity, not adherent or embedded in any structures, and submitted for evidence. The projectile consists of a medium caliber, copper jacketed lead bullet. In addition, fragments of copper jacket and lead from the projectile were recovered just external to the anterior 5th intercostal space.

The direction of the wound is front-to-back, slightly downward, and slightly left to right.

The wound path penetrates the right upper chest, through the 5th intercostal space, perforates the right middle and right lower lung lobes, grazes the right hemidiaphragm, and terminates within the right chest cavity.

Gunshot wound "B":
The entrance wound is ovoid and measures ½ x⅜ inches, with a 1/16 inch circumferential marginal abrasion. The entrance wound is situated at the left upper abdomen. It is centered 20 ¼ inches from the vertex and 1 inch to the left of midline. There is no soot or stippling.

The exit wound is C-shaped and measures ¾ x ¼ inches with opposable edges. The wound exit is situated at the right lower back. It is centered 25 inches from the vertex and 2 ¼ inches to the right of midline. There is no soot or stippling.

No projectile was recovered at autopsy.

11/8/2011  bl (10574)

Lawrence L. Nguyen, M.D., Forensic Pathologist

## ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

CEJA, Marcel Luis                                                    11-04061-BA
                                                                    Page 4

The direction of the wound is front-to-back, downward, and left-to-right.

The wound path penetrates through the left upper abdomen, antrum of the stomach, head of the pancreas, left lobe of the liver, inferior vena cava, and exits the right lower back.

Gunshot wound "C":
The entrance wound is round and measures ⅜ x ⅜ inches. The entrance wound is situated at the left posterolateral wrist. There is no soot or stippling.

The exit wound is irregularly-shaped and measures ⅞ x ½ inches. The wound exit is situated at the base of the left thumb. There is no soot or stippling.

A small fragment of copper jacket and a small fragment of lead core were recovered from the wound tract and submitted for evidence. It is possible for wound "C" to be associated with wounds "A" or "B".

The wound path penetrates through the soft tissues and bone of the left wrist and base of thumb.

MINOR INJURIES:
- There are small focal red abrasions on the right knee.
- There is an ovoid ring-shaped abrasion (⅞ x ⅝ inches) with central sparing of intact skin (¼ x ¼ inches) located on the left shoulder.

INITIAL INCISION: The body cavities are entered through the standard Y-shaped incision and the standard coronal incision. No foreign material is present in the mouth, upper airway or trachea.

NECK:  The neck organs are removed en bloc with the tongue. No lesions are present nor is trauma of the gingiva, lips, or oral mucosa demonstrated. There is no edema of the larynx. Both hyoid bone and larynx are intact and without fractures. No hemorrhage is present in the adjacent throat organs, investing

Lawrence L. Nguyen, M.D., Forensic Pathologist

# ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

**CEJA, Marcel Luis**

**11-04061-BA**
**Page 5**

fascia, strap muscles, thyroid, or visceral fascia. There are no prevertebral fascial hemorrhages. The tongue, when sectioned, shows no trauma.

CHEST/ABDOMINAL CAVITY: The right pleural cavity contains 200 cc of bloody fluid. The left pleural cavity contains 300 cc of bloody fluid. The lungs are poorly expanded. The subcutaneous fat of the abdominal wall measures 2.5 cm. The organs of the abdominal cavity have a normal arrangement and none are absent. There is a moderate amount of bloody fluid in the abdominal cavity. The peritoneal cavity is without evidence of peritonitis.

## SYSTEMIC AND ORGAN REVIEW

CARDIOVASCULAR SYSTEM: The aorta is elastic and of even caliber throughout with vessels distributed normally from it. The thoracic and abdominal aorta are without atherosclerosis. There is no tortuosity or widening of the thoracic segment. There is no dilation of the lower abdominal segment. No aneurysm is present. The pericardial sac has been previously opened. The epicardium shows scattered and confluent petechial hemorrhages.

The heart weighs 350 grams and has a normal configuration. The right ventricle is 0.5 cm thick. The left ventricle is 1.5 cm thick. The interventricular septum is 1.5 cm thick. The chambers are normally developed and are without mural thrombosis. The valves are thin, leafy, and competent.

There is no endocardial discoloration. There are no gross lesions of the myocardium. There is no abnormality of the apices of the papillary musculature. There are no defects of the septum. The great vessels enter and leave in a normal fashion. The coronary ostia are patent. There is a normal pattern of coronary artery distribution. There is no coronary atherosclerosis of the major coronary arteries. The blood within the heart and large blood vessels is liquid.

RESPIRATORY SYSTEM: Moderate secretions are found in the upper respiratory passages. The mucosa is intact and pale. The lungs are crepitant.

Lawrence L. Nguyen, M.D., Forensic Pathologist

## ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

CEJA, Marcel Luis

11-04061-BA
Page 6

---

The left lung weighs 300 grams and the right, 370 grams. The visceral pleurae are smooth and intact. The parenchyma is unremarkable. The pulmonary vasculature is without thromboembolism.

GASTROINTESTINAL SYSTEM: The esophagus is intact throughout. The stomach is distended. It contains 210 grams of dark red clotted and coagulated blood. The mucosa is unremarkable. Portions of tablets and capsules cannot be discerned in the stomach. The small intestine and colon are examined by inspection, palpation, and multiple incisions, and are unremarkable. The appendix is present. The head of the pancreas shows trauma, as previously described. The remainder of the pancreas is lobular and firm. There is no early autolysis or necrosis.

HEPATOBILIARY SYSTEM: The liver weighs 1400 grams, is of average size, and is tan-brown. The consistency of the parenchyma is soft. The cut surface is smooth. There is a normal lobular arrangement. The left lobe of the liver shows extensive disruption. The gallbladder is present.

URINARY SYSTEM: The left kidney weighs 140 grams and the right, 140 grams. The kidneys are normally situated and the capsules strip easily, revealing a surface that is pale. The corticomedullary demarcation is preserved. The urinary bladder is unremarkable. It contains no urine.

GENITAL SYSTEM: The prostate is without enlargement or nodularity. Both testes are in the scrotum and are unremarkable.

HEMOLYMPHATIC SYSTEM: The spleen weighs 90 grams. The capsule is intact. The parenchyma is dark-red. There is no increased follicular pattern. Lymph nodes throughout the body are small and inconspicuous. The bone density is unremarkable. The bone marrow of the rib is unremarkable.

ENDOCRINE SYSTEM: The thyroid is unremarkable. The parathyroid glands are not identified. The adrenals are unremarkable.

11/8/2011  bl (10574)

Lawrence L. Nguyen, M.D., Forensic Pathologist

## ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

**CEJA, Marcel Luis**

11-04061-BA
Page 7

HEAD AND CENTRAL NERVOUS SYSTEM:   There is no subcutaneous or subgaleal hemorrhage in the scalp. The external periosteum and dura matter are stripped, showing no fractures of the calvarium or base of the skull. There are no tears of the dura matter. There is no epidural, subdural, or subarachnoid hemorrhage.

The brain weighs 1510 grams. The leptomeninges are thin and transparent. A normal convolutionary pattern is observed. Coronal sectioning demonstrates a uniformity of cortical gray thickness. The cerebral hemispheres are symmetrical. There is no softening, discoloration, or hemorrhage of the white matter. The basal ganglia are intact. Anatomic landmarks are preserved. Cerebral contusions are not present. The ventricular system is unremarkable, without dilation or distortion. The pons, medulla, and cerebellum are unremarkable. There is no evidence of uncal or cerebellar herniation. The vessels at the base of the brain have a normal pattern of distribution.   There are no aneurysms. The cerebral arteries are without arteriosclerosis.

Lawrence L. Nguyen, M.D., Forensic Pathologist

## ORANGE COUNTY SHERIFF-CORONER
## AUTOPSY REPORT

CEJA, Marcel Luis                                      11-04061-BA
                                                       Page 8

AUTOPSY FINDINGS

1.    Gunshot wound "A":
      a.    Entrance – right upper chest, no soot or stippling.
      b.    Exit – none.
      c.    Projectile – medium caliber, copper jacketed lead bullet.
      d.    Path – right upper chest, right middle and right lower lung lobes, terminating in right chest cavity.
2.    Gunshot wound "B":
      a.    Entrance – left upper abdomen, no soot or stippling.
      b.    Exit – right lower back.
      c.    Projectile – none recovered.
      d.    Path – left upper abdomen, stomach, pancreas, liver, inferior vena cava, exiting the right lower back.
3.    Gunshot wound "C":
      a.    Entrance – left posterior lateral wrist, no soot or stippling.
      b.    Exit – left base of thumb.
      c.    Projectile – fragments of copper jacket and lead recovered.
      d.    Path – soft tissues and bone of the left wrist and base of thumb.

11/8/2011  bl (10574)                          Lawrence L. Nguyen, M.D., Forensic Pathologist

CEJA, Marcel Luis                                                                    11-04061-BA



AUTOPSY RECORD

GUNSHOT WOUND) S

11 - 04061 - BA

CEJA, MARCEL LUIS

wound A entrance
ovoid 3/4 x 5/8
RA 4/16
TO4 17
ROM 1
∅ S/S

wound B entrance
ovoid 1/2 x 3/8
RA 4/16
TO4 20 3/4
LOM 1
∅ S/S

wound C exit
irregular 7/8 x 1/2

wound C entrance
round 3/8 x 3/8

wound B exit
C-shaped 3/4 x 1/4
edges opposable
TO4 25
ROM 2 1/4
∅ S/S

M.D.

1



## ORANGE COUNTY SHERIFF-CORONER
## HISTOLOGY REPORT

CEJA, Marcel Luis

11-04061-BA
Page 1

### MICROSCOPIC EXAMINATION

HEART:
- Sections of right ventricle, left ventricle, and interventricular septum are unremarkable.

LUNGS:
- Unremarkable.

KIDNEYS:
- Unremarkable.

LIVER:
- Unremarkable.

SPLEEN:
- Unremarkable.

BRAIN:
- Sections of cortex and cerebellum are unremarkable.

Lawrence L. Nguyen, M.D., Forensic Pathologist

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

July 7, 2013

Mr. Federico-Castelan Sayre, Esq.
Sayre & Levitt, LLP
333 Civic Center Drive West 6
Santa Ana, California 92701

**Regarding:** **Barbara Padilla, et al., v. City of Anaheim, et al., Case No.: SACV12-622
JVS (JPRx).**

Dear Mr. Sayre:

Thank you for retaining me to analyze and render opinions regarding the November 4,
2011, shooting death of Mr. Marcel Ceja, by Anaheim Police Department (APD) Officer
David Garcia.  Pursuant to the requirements of Rule 26, I have studied the reports,
photographs, deposition transcripts and other material (as listed below) provided to me
thus far regarding this case.  Please be advised that if additional material is provided
(including depositions), a supplementary report will be necessary, in order to express my
complete opinion.

It is also necessary to state at the beginning of this report that I do not make credibility
determinations in expressing my opinions.  That is, where there are differences in the
events proffered by the defendants versus those proffered by the plaintiff and civilian
witnesses, I do not opine for the trier of fact regarding who are the more believable
witnesses.  The resolution of any such conflicts are obviously within the purview of a jury
to decide.

## Material Reviewed Thus Far:

1.     Plaintiff's Complaint for Damages.

EXHIBIT

3

2.      Reports and documents as follows:
   a.      Anaheim Police Department Reports.
   b.      Orange County District Attorney Office's Investigation.
   c.      Orange County District Attorney's Officer Bureau of Investigation: Interview Report.
   d.      Orange County Sheriff Coroner Autopsy Report.
   e.      Orange County Crime Lab: Toxicology Report.
   f.      Photographs of Injuries to Mr. Marcel Ceja.

3.      Deposition Transcript of Officer David Garcia, June 4, 2013.

4.      California POST Basic Learning Domains as Follows:
   a.      #1: "Leadership, Professionalism & Ethics."
   b.      #2: "Criminal Justice System."
   c.      #3: "Policing in the Community."
   d.      #5: "Introduction to Criminal Law."
   e.      #15: "Laws of Arrest."
   f.      #16: "Search and Seizure."
   h.      #20: "Use of Force."
   i.      #21: "Patrol Techniques."
   j.      #33: "Arrest Methods/Defensive Tactics."
   k.      #35: "Firearms/Chemical Agents."

6.      Images of the shooting scene via the internet.

**Brief Overview of Events:**

On November 04, 2011, Mr. Ceja was 22-years-old, and was legally walking in the area during daylight hours. Mr. Ceja had no warrants for his arrest, and was not a suspect in any crime. Additionally, no crime had been reported to the APD that could be linked to Mr. Ceja. Officer Garcia was on routine solo patrol in a marked APD vehicle.

According to Officer Garcia, Mr. Ceja and his two friends were wearing hooded sweat shirts, and drew his suspicion. Officer Garcia has stated that their dress suggested that they were possibly concealing their identities. However Officer Garcia did not report his suspicions to his dispatch. As Officer Garcia drove west on East Ball Street, he drove by the three and intentionally paid no attention to them. Next, Officer Garcia turned right on

State College Boulevard, then right on Almont Avenue, and finally took a right on Ballhaven Street. According to Officer Garcia, this would place him back on Ball Street and behind Mr. Ceja and his friends, and he could pull up and talk with them. However, upon reaching Ball Street, Officer Garcia, looked west, and did not see Mr. Ceja and his friends.

Officer Garcia then looked to his left, and saw the three walking on the north sidewalk and heading east on Ball Street. According to Officer Garcia, this piqued his interest in the three, and he immediately turned left and drove east in the westbound lane of Ball Street. Officer Garcia drove several yards, and parked his patrol car near an alley, and exited with his baton in hand. Officer Garcia did not request a back-up officers via his radio.

According to Officer Garcia, he said, "can I talk to you [guys] for a sec?" Next, Mr. Ceja turned around and began walking toward Officer Garcia, and the other two ignored the question, and continued to walk east on Ball Street. As Mr. Ceja neared Officer Garcia, approximately 5 to 7 feet, he turned, and noticed that his friends had continued walking. According to Officer Garcia, Mr. Ceja turned and ran apparently because he realized that his friends were not with him. According to Officer Garcia, he focused all his attention Mr. Ceja and when he ran away, he pursued him afoot.

The chase meandered through an apartment structure, and eventually headed west on Ball Street. According to Officer Garcia, as the chase continued, he noticed Mr. Ceja remove a shiny object (later determined to be a handgun) from his waist area. Officer Garcia has stated that when he removed the gun, Mr. Ceja did not turn and point the gun at Officer Garcia, nor did he threaten to shoot Officer Garcia at any point in their encounter:

> Q.  "He never pointed a weapon at you at any time, correct?"
> A.  "He didn't have another weapon on him."
> Q.  *"Did he ever point a weapon at you at any time?"*
> A.  *"Not that I had seen."*  (Officer Garcia deposition, Page 75. Emphasis added.)

Next, Officer Garcia radioed to dispatch that he was in foot pursuit and that his subject had a shinny object in his hand. As the foot pursuit continued, Mr. Ceja lost his balance, and stumbled. Officer Garcia stated that when Mr. Ceja stubbled, the "object" he had in his hand, was ejected and landed in some bushes near the apartments. From that point on, the threat posed by the "object" no longer existed.

At this point in the sequence of events, there were three witnesses.  Witnesses have stated
that Officer Garcia ordered Mr. Ceja to show his hands.  According to Officer Garcia,
Mr. Ceja did not comply and continued to conceal his left hand in his left sweat-shirt
pocket.  (According to one witness, they saw Mr. Ceja's right hand in his right pant's
pocket.)  Nonetheless, Officer Garcia alleged that Mr. Ceja did not obey the order.  Next,
according to Officer Garcia, Mr. Ceja brought himself into a seated position, and rotated
towards Officer Garcia.

According to Officer Garcia, Mr. Ceja continued to conceal his hand.  Allegedly fearing
for his safety, Officer Garcia fired two rounds into Mr. Ceja's front "center mass".  One
bullet entered Mr. Ceja's chest, and the other went through his left wrist, exited his lower
thumb, and entered his upper left abdomen.  There was no hole in the sweat shirt pocket
that Officer Garcia alleged Mr. Ceja had his left hand in.  Therefore, the trajectory of the
bullet through his left wrist documents that when Officer Garcia fired his gun, Mr. Ceja's
left hand was not in his sweat shirt pocket but was, in fact in view – not hidden inside his
sweat-shirt pocket.  When confronted with this discrepancy Officer Garcia had no
answer:

> A.    "I recall his hand was in his left pocket."
> Q.    "Okay. Do you have any explanation how he could
>        have been shot through the hand in his left pocket and
>        there's no holes in the left pocket?"
> A.    "No."  (Officer Garcia deposition, Pages 83 & 84.)

I have also noted that Officer Garcia testified that he was behind a car *when he fired* upon
Mr. Ceja.  In his interview, he stated that he took cover behind the parked vehicle *after he
shot* Mr. Ceja:

> Q.    "You were in the process of taking cover?"
> A.    "Yes."
> Q.    "Before you shot him?"
> A.    "Yes."  (Officer Garcia deposition, Page 84.)

After taking cover behind a car, Officer Garcia continued to fix his weapon on Mr. Ceja.
Soon after the shooting, Officer Park arrived, and handcuffed Mr. Ceja.  Eventually
Anaheim Fire transported Mr. Ceja to the University of California Irvine Medical Center.
Mr. Ceja underwent emergency surgery, but died as a result of the gunshot wounds at
approximately 2:16 am the next morning (November 5, 2011).

**Opinions Thus Far:**

1.  The trajectory of the rounds fired and the deposition testimony of Officer Garcia supports the conclusion that Mr. Marcel Ceja was unarmed with his hands visible to Officer Garcia and that Mr. Ceja was not armed and made no threats when when Officer Garcia fired his gun. Additionally, according to his own testimony Officer Garcia had observed that Mr. Ceja had previously thrown or dropped the "object" (later discovered to be a handgun) before he fired his gun. Also, the physical bullet trajectory (the through-and-through wound in his left hand) documents that Mr. Ceja's hand was not inside his sweat-shirt pocket as alleged. Therefore, Officer Garcia should not have fired his weapon, because he was not confronted with an "immediate defense of life" situation.

2.  When he engaged in a solo foot pursuit, Officer Garcia did not follow the tactical guidelines required of every Basic POST certified law enforcement officer in this incident.

3.  Officer Garcia had various less-than-lethal and/or non-force options available to him, including using his radio and calling in back-up units andset up containment and a perimeter to apprehend Mr. Ceja without the use of lethal force.

4.  The Anaheim Police Department, through its chain of command, appears to have endorsed the dangerous and out-of-policy tactics that are connected to this incident. As such, their collective approval of these tactics puts the communities they serve at unnecessary future risk of death and/or injury from Officer Garcia and others on the department who have been, or are now, similarly trained and/or supervised.

**Professional Standards Regarding the Use of Force:**

Early on in the POST Basic Academy, the seriousness of the unique powers imbued on Law Enforcement Officers is stressed with the required responsibility they have to use them with "great care". It is clear that there is no room for unprofessional, immature and/or hot-headed individuals in the law enforcement profession. This is best expressed in Learning Domain # 2: "Criminal Justice System:"

"The criminal justice system gives law enforcement two extraordinary
powers:

> 1.   The power of arrest and
> 2.   The power to use deadly force.

> The authority to do so does not come from the rule of an
> authoritarian dictator.  Rather it comes from the will and consent of
> the people who *put their trust in law enforcement to use that power
> with the utmost of care and restraint.*  This is why it is important to
> emphasize that peace officers do not confer "police powers" on
> themselves.  These powers come to the criminal justice system from
> the people they serve."  (Learning Domain #2: "Criminal Justice
> System," page 1-4.  Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which
force option is approved and appropriate under the concept of the "totality of
circumstances."  In other words, per the POST requirements, officers are not justified in
any use of force based upon "subjective" fear.  The POST standard of "Reasonable Fear"
is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer
safety based on actually perceived circumstances.* POST defines "Unreasonable Fear" as:
*Generated in the officers's mind with no direct correlation to facts and situations.*
(Learning Domain # 20, Chapter 5. Emphasis added.).  Officers are also taught that POST
requires that any use of deadly force must be based on an "objective" "reasonable
necessity" of action to "imminent danger." (Learning Domain # 20, Chapter 3).  The
following quotes typify the training:

> "A reasonable officer is defined as an officer with similar training,
> experience, and background in a similar set of circumstances, who will
> react in a similar manner."  "Unreasonable force occurs when the type,
> degree and duration of force employed was not necessary or
> appropriate."(Learning Domain #20: "Introduction to the Use of Force,"
> page 1-4.)

Peace officers are also trained that by accepting their badges and guns they must act at all
times in consideration of the extreme value our society places on all human life.  Firing a
firearm at a human being is different from all other police uses of force.  While there are
other police tactics and tools that can qualify as deadly force, none carry the same high
probability of death as the use of the officer's firearm.  Accordingly, officers are trained

that they can only use firearms under the most extreme circumstances. These situations are very rare. In fact, studies indicate that only a very few police officers in the United States – less than 5 percent – ever fire their weapons in the field during their entire careers.

Officers are also trained that force used in self-defense must be proportional to the threat, and that force used to control must be "objectively reasonable" under the circumstances. Police officers are also trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life, even when that means facing certain risks themselves. Firing one's firearm at a human being is simply different from all other police uses of force. POST also specifies that the use of force is only justified based upon the "Reasonable Fear" standard, which is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officers's mind with no direct correlation to facts and situations.* (Learning Domain # 20, Chapter 5. Emphasis added.). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective") "reasonable necessity" of action to "imminent danger." (Learning Domain # 20, Chapter 3).

The POST training domains in this regard have identified an officer's mentality to make such a decision (to depart from basic tactics) and given a specific name to tactical mistakes that are likely to lead to injury or death as: "Fatal Error." The following "fatal errors" are apparent in this set of facts:

Fatal Errors:

"Officers should keep in mind and avoid committing any of the following fatal errors while on patrol." (POST Learning Domain # 21, pages 1-21 & 1-22.)

*Inappropriate attitude:*
- Too aggressive.
- Poor or no planning:
- No consideration of alternative actions.

*Inadequate communication:*
- Failure to communicate with assisting officers.

*Poor Positioning:*
- Abandoning a safe position.
- Being too close or directly in front of the threat.

Few (if any) incidents within the police profession are more serious than a person being shot at the hands of a police officer. When untrue statements (as alleged by the Plaintiff) are used to justify the use of deadly force, it is an egregious violation of law, and strikes at the heart of the public trust and confidence in the very agency empowered to ensure their safety and security.

> "The use of deadly force is the most serious decision a peace officer may ever have to make. *Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.*

> "Deadly force applied by a peace officer is force likely to cause death or serious bodily injury.

> "Reverence for life is the foundation on which the use of deadly force rests. Deadly force is always the last resort used in the direst of circumstances. The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.

## Officer Garcia's Inadequate Tactics:

Officer Garcia was a solo patrol officer. His encounter with Mr. Ceja and those with him was three on one. The nature of his inquiry was suspicious activity only. (As stated above, Officer Garcia had no information whatsoever that Mr. Ceja or anyone with him was wanted for a crime or had committed any crime.) When Mr. Ceja and his companions bolted upon Officer Garcia's approach, Officer Garcia should never have chased after him alone. Solo foot pursuits are discussed at length in POST (Patrol Techniques - Learning Domain #21) and are identified as a fundamental "Fatal Error" to be avoided. The most obvious (and expected) tactic in this situation was to immediately use the radio to communicate to all officers in the area, begin a coordination and set up a containment for a safe detention and apprehension.

## Officer Garcia's Use Of Deadly Force:

Officers are trained that the use of deadly force constitutes a lawful and justifiable act of self-defense when the officer using deadly force actually and reasonably believes one or more of the following facts exist:

- That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.

- That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.

- That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime, or other obvious factors.  In such cases deadly force is not allowed to prevent the escape of misdemeandents and most felony suspects.

Thus, it is necessary to determine whether, at the moment Officer Garcia decided to fire his weapon, those beliefs were reasonable.  This is a core issue at the heart of this litigation because Officer Garcia has testified that he fired his weapon in self-defense because he determined that Mr. Ceja possibly had a weapon in his left hand which was concealed in his swear shirt pocket.  Officer Garcia also knew (pursuant to his POST training regarding the use of firearms) that he was legally and morally required to assess potential threats solely according to an "objectively reasonable" standard (rather than from a subjective fear) and to respond to any such perceived threat on that basis.

As stated above, the details, as described by Officer Garcia, regarding the positioning, movements and shots fired at Mr. Ceja appear not do not correlate with the evidence presented.  Officer Garcia has testified that Mr. Ceja had his left hand inside his sweatshirt and was holding a possible weapon, when fired at by Officer Garcia.

If Officer Garcia believed that Mr. Ceja was a suspect of a crime, considering the circumstance known to Officer Garcia at the time, it would have been a reasonable alternative to contain the area without moving forward, and maintain cover rather than confronting Mr. Ceja.

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty-seven year veteran of the Los Angeles County Sheriffs Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993.

Page 9 of  14

My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriffs Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of the 700 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the

suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Pennsylvania, and Washington. I have testified before the Los Angles Police Department Board of Rights. I have testified before the Harris County (Texas) Grand Jury. I have also submitted written opinions in matters before Alaska, Florida, Idaho, Montana, North Carolina, Oregon and Wyoming Federal and State Courts.

I have testified before the Los Angles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Accountability Project, National Lawyers Guild Convention, New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons".

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project, and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in <u>Border Network, et al. v. Otero County, et al.</u>, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force. <u>Blankenhorn v. City of Orange, et al.</u>, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. <u>Torres, et al v. City of Los Angeles, et al.</u>, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The <u>Torres</u> case was appealed to the U.S. Supreme Court and returned for trial. The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, <u>Hayes v. County of San Diego</u>, - F.3d -, 2011 WL 2315191 (9th Cir. 2011), and <u>Young v. County Of Los Angeles</u>, 2011 WL 3771183 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, <u>Starr v. Baca</u>, - F.3d -, 2011 WL 2988827 (9th Cir. 2011). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in Lindsey Bishop and Carolyn Clark, v. Tony Arcuri, City of San Antonio. USDC Court of Appeals, Fifth Circuit, Case No. 11-50010, March 09, 2012. The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in Nelson v. City of Davis, __ F.3d __, 2012 U.S. App. LEXIS 14140 (9th Cir. 2012).

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, <u>Macias v. County of Los Angeles</u>, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical 5 year effort to bring this law into effect.

I have been found competent by both Federal and State Courts to render opinions as to the duties and responsibilities of police officers regarding their individual and collective

responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil Mr. Fosters and as criminal defendants.

Since my retirement I have become an expert in the features and the use of TASER International's products, including the Model M26 and Model X26 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are Lee v. Nashville, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and Heston v. City of Salinas, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct.  Executed July 7, 2013, at Santee, California.

Roger A. Clark

Page 14 of 14

**REPORT OF MARC A. FIRESTONE, PH.D.**
**IN THE MATTER OF**
**PADILLA V. CITY OF ANAHEIM**

## 1. Qualifications

### 1.1. Education

    **1.1.1.** I am a trained physicist with a B.S., M.S., and Ph.D. degrees in physics from the University of Michigan.

    **1.1.2.** I completed over 1000 hours of in-house training in forensic engineering at von Haenel & Associates, Inc.

### 1.2. Work Experience

    **1.2.1.** I spent over 20 years as a research physicist/engineer doing contract work for agencies of the federal government including NASA, and the Departments of Defense and Energy. During this time period I worked for two universities and several private contract research companies. My professional responsibilities were in the general areas of satellite dynamics and control, controlled thermonuclear fusion reactors, and nuclear weapons phenomenology and effects. I have published over 30 scientific papers and reports in these areas and given numerous presentations at scientific conferences and workshops.

    **1.2.2.** Since 1995 I have been employed full time as a forensic engineer. My cases cover a wide spectrum of technical issues that utilize my training and experience in the physical sciences and mathematics. These include slip/trip and fall, vehicular accidents, product defects, fire and explosion analysis, radiation effects, and bullet trajectory and blood spatter analysis. My clients include insurance companies, civil defense and plaintiff attorneys, and criminal defense attorneys and prosecutors. I have worked for city, county, and state government agencies. I have presented a lecture series on vehicular accident reconstruction for M.C.L.E. credit and given lectures to attorney groups.

## 2. Summary of the Case

On 4 November 2011, at approximately 1154, Officer David Garcia of the Anaheim Police Department encountered Marcel Ceja and two other males in the vicinity of Ball Road and Belhaven Street in Anaheim, CA. After walking up to them and asking them to talk to him, Mr. Ceja approached him and the other two males continued walking away. Then Mr. Ceja turned and ran away. Officer Garcia chased Mr. Ceja. During the chase Mr. Ceja tripped and a handgun flew from his right hand just before or during the fall. Mr. Ceja then turned towards Officer Garcia while sitting up. According to Officer Garcia, Mr. Ceja put his left hand into his sweatshirt pocket and appeared to be manipulating something inside the pocket. Officer Garcia, fearing that Mr. Ceja had a second gun in his left sweatshirt pocket, ordered him to show his hands. When Mr. Ceja did not Officer Garcia fired two shots at Mr. Ceja and killed him.

EXHIBIT

4

3. **Areas of Investigation**

I have been retained by the attorneys for the plaintiffs to analyze the shooting incident that
resulted in the death of Marcel Ceja. To this end I have inspected the shooting scene and Mr.
Ceja's clothing at the time of the incident. I reviewed various documents generated in this
incident. I also made measurements, took photographs, and performed calculations.

4. **Opinions**

**4.1.** Mr. Ceja was facing approximately 18 degrees clockwise (to Officer Garcia's left) from
Officer Garcia's perspective when he was shot. This result is calculated from gunshot
wound B's entrance and exit positions and Ceja's approximate torso depth.

    4.1.1.   This entails a rotation away from a direct line of sight to Officer Garcia and is
thus not a favorable orientation for Mr. Ceja to shoot from.

    4.1.2.   This position is consistent with a movement of Mr. Ceja's left hand up across his
chest in a protective maneuver.

**4.2.** Officer Garcia was in the range of 12 feet away from Mr. Ceja when the shots were
fired. This is based on the downward angle of gunshot wound B of approximately 25.4
degrees, the downward (north to south) slope of approximately 20 degrees where Mr.
Ceja was shot, his location of approximately 5 feet north of the north edge of the
sidewalk as indicated by the position of the black bandana, Ceja's approximate torso
depth, and an assumed gun height of 4 feet above ground.

    4.2.1.   This estimate would place Officer Garcia's gun when he fired at the south edge of
the sidewalk or just south of the south edge facing primarily north. It is also
consistent with the gun at the north edge of the sidewalk and Officer Garcia facing
primarily west. However, the position of the bullet casings would favor the gun in
the area of the south edge of the sidewalk.

    4.2.2.   In his deposition Officer Garcia estimated he was 5 to 15 feet away from Mr. Ceja
when he shot. In his interview with the Orange County District Attorney's Office he
estimated 5 to 10 feet away when he shot.

    4.2.3.   Witness Clements indicated that he saw Officer Garcia with his gun pointed about
10 feet from Mr. Ceja.

    4.2.4.   Witness Diane Jackson saw Officer Garcia standing on the sidewalk with his gun
drawn and pointed in a western direction from her balcony. She could not see Mr.
Ceja because her sightline to him would have been blocked by her balcony.

**4.3.** The location of Mr. Ceja's gun was approximately 8 feet north of the black bandana. If
the black bandana is the approximate position of Mr. Ceja on the ground then his gun
had to be purposely thrown away prior to or during his fall.

    4.3.1.   At my site inspection on 10 May 2013, the ivy in the planter was approximately
4.5 inches high. At this height the gun could not have slid out of Mr. Ceja's hand as
he was falling and traveled 8 feet.

    4.3.2.   The scene photos taken by the Orange County Crime Lab show a very similar
density and height of the ivy ground cover that I observed at my site inspection.

    4.3.3.   In his interview with the Orange County District Attorney's Office Officer Garcia
drew a distinction between someone throwing a gun away and someone who just

loses it in a fall. The one throwing the gun away is in the process of giving up whereas this is not the case if the gun is unintentionally dropped.

**4.4.** Officer Garcia, in his interview with the Orange County District Attorney's Office and in his deposition, was adamant that he fired two rounds while Mr. Ceja's left hand was in his sweatshirt's left pocket.

4.4.1.   In his interview, the primary reason Officer Garcia gives for shooting Mr. Ceja is that Ceja's left hand was in his sweatshirt's left pocket. Officer Garcia said he saw the left hand go into the pocket and Mr. Ceja then started to manipulate something in the pocket. Fearing it was a gun, Officer Garcia fired his weapon. After shooting Mr. Ceja, Officer Garcia then retreated to take cover because Mr. Ceja still would not take his hand out of his pocket. In his deposition Officer Garcia reiterated that he had a clear view of the sweatshirt.

4.4.2.   In the Autopsy report gunshot wound C is through the left hand. The entrance is on the posterior lateral wrist and the exit is at the base of the thumb. The report postulates that the bullet went through the left hand and then continued into either the upper right chest, gunshot wound A, or the left upper abdomen, gunshot wound B. This requires the left hand be positioned in front of the chest with the fingers partially pointing downward and the back of the hand facing the oncoming bullet.

4.4.3.   Officer Garcia's scenario of the shooting incident requires that there be a bullet hole in the left pocket of Mr. Ceja's sweatshirt. However, upon inspection there is no bullet hole, or defect of any kind in this pocket. Likewise, there was no hole or defect in the right pocket.

**4.5.** The physical evidence leads to the conclusion that Officer Garcia purposely shot Mr. Ceja twice while his empty left hand was in front of his chest. The empty hand would have been perfectly visible to Officer Garcia. His statements and testimony are so at variance with the physical evidence that one has to conclude Officer Garcia purposely lied about the facts of this shooting incident.

## 5. Materials Reviewed.

5.1. Officer Involved Shooting Report dated 6 December 2012, Office of the District Attorney, Orange County, CA.

5.2. Orange County District Attorney's Office Bureau of Investigation Interview Report dated 16 December 2011.

5.3. Anaheim Police Department General Occurrence Hardcopy, GO#2011-167108 Open, AOD-15 AOD-OC DA.

5.4. Orange County Sheriff-Coroner Autopsy Report and photos of Case Number 11-04061-BA.

5.5. Orange County Crime Lab photos.

5.6. Deposition of David Garcia, 4 June 2013.

5.7. Orange County evidence reports and scene sketches.

5.8. Interview of witness Alejandro Ramirez, Law Office of Sayre & Levitt, 1 December 2011.

5.9. Physical evidence maintained by the Anaheim Police Department.

6. **Contemplated Additional Work**
   Additional work will include reviewing any discovery materials that have not been available at this time.

7. **Compensation**
   I have been engaged by plaintiff's attorney, Federico Sayre, as a member of the Consultants Bureau of Kashar Technical Services, Inc. The rate the Consultants Bureau charges for my services is $400.00 per hour for all aspects of the case including travel, inspection, review of materials, analysis, deposition and trail testimony.

8. **Exhibits**
   8.1. Deposition Testimony of Marc A. Firestone during the last four years.
   8.2. Trial Testimony of Marc A. Firestone during the last four years.
   8.3. Curriculum Vitae of Marc A. Firestone.

Marc A. Firestone, Ph.D.                    2 July 2013

## 8.1   DEPOSITION TESTIMONY WITHIN THE PAST 4 YEARS

- Ramon and Hernandez v City of Los Angeles, et al. 4/16/09        testified for the plaintiffs
- Moreno v Union Pacific Railroad Co. and Parsec, Inc.   5/6/09        testified for the defendants.
- Kosakoff v City of San Diego, et al.  1/26/10        testified for the plaintiff
- Williams v County of Ventura, et al. 2/18/10        testified for the plaintiff
- Kubeck v California Department of Transportation, et al.   10/4/10        testified for the plaintiff
- Tamas v T. L. Pavlich Construction, 7/7/10  testified for the defendant.
- Williams v County of Ventura, et al  2/29/12        testified for the plaintiff
- Srabian v County of Fresno, et al.   9/20/12        testified for the plaintiff

## 8.2    TRIAL TESTIMONY WITHIN THE PAST 4 YEARS

- Adams v Officer Paul Speers, et al.   1/28/09        United States District Court, Eastern District of California – Fresno, testified for the plaintiffs
- People v Keyasunn Stinson   3/3/09        Los Angeles County Superior Court – Los Angeles, testified for the defendant
- Moreno v Union Pacific Railroad Co. and Parsec, Inc.        7/14/09        Los Angeles County Superior Court – Los Angeles, testified for the defendants.
- People v Michael Mcarthy     10/23/09     Los Angeles County Superior Court – Van Nuys, testified for the defendant
- People v Brandon Mani     12/10/09     Los Angeles County Superior Court – Torrance, testified for the defendant
- People v Rudolpho Negrete   2/23/10        Ventura County Superior Court, testified for the defendant
- Ramon and Hernandez v City of Los Angeles        2/24/10        Los Angeles Superior Court – Central District, testified for the plaintiffs
- People v Matthew Titiriga   6/15/10     Los Angeles County Superior Court – Santa Clarita, testified for the defendant
- People v Samuel Rush        9/27/10        Ventura County Superior Court, testified for the defendant
- People v Juan Navarro        5/4/11        Los Angeles County Superior Court – Pomona, testified for the defendant
- Tamas v T.L. Pavlich, et al.   5/10/11        Los Angeles County Superior Court – Chatsworth, testified for a defendant
- People v Brad Scott   9/23/11        Los Angeles County Superior Court – Long Beach; testified for the prosecution
- People v Jose Elias   11/15/11        Los Angeles County Superior Court – Alhambra, testified for the defendant in an Evidence Hearing
- People v Shai Greenberg     2/24/12        Ventura County Superior Court, testified for the defendant in a Preliminary Hearing
- People v Shelly Bryant        3/19/12     Los Angeles County Superior Court – Compton, testified for the defendant
- People v Phillip Rogers        6/25/12        Los Angeles County Superior Court – CJC, testified for the defendant
- Srabian v County of Fresno, et al.   1/18/13        United States District Court, Eastern District of California - Fresno, testified for the plaintiff
- People v Jared Holehouse     6/13/13        Monterey County Superior Court – Salinas, testified for the defendant

## 8.3   CURRICULUM VITAE

**Marc A. Firestone, Ph.D.**

**<u>SUMMARY:</u>**     Dr. Firestone's Primary Field of Expertise: Physics.  In addition, Dr. Firestone is also qualified to act as principal investigator in the scientific investigation of claims involving the following types of analysis:

**Vehicles:**
Determination of speed from Skidmarks, Post-Collision Dynamics and Crush in Collisions.
Failure of Sub-Systems, including Steering, Braking, Fuel and Suspension in Collisions.
Time-motion Studies
Determination of Critical Speed and Tipping Characteristics
Analysis of Highways for Design/Construction Hazards

**Criminal:**
Assault with deadly weapons (vehicle, gun, knife, etc.)
Bullet and projectile trajectory analysis
Blood spatter analysis
Physics of human movement

**Products:**
Determination of Failure of Mechanism
Defect in Product Design
Defect in Manufacturing Process

**Fire:**
Cause and Origin of fires occurring accidentally in Structures and Vehicles
Arson

**Industrial:**
Machine Design
OSHA and Other Code Compliance
Safety / Light Industrial Hygiene
Electronic design and packaging

**Miscellaneous:**
Environmental testing
Code Compliance relating to stairways, walkways and ramps
Illumination, temperature and noise levels
Slip and Trip analysis
Electromagnetic and Nuclear Radiation effects

## 8.3   CURRICULUM VITAE (Cont.)

### EXPERIENCE

**von Haenel and Associates, Inc. - Oxnard, California         1995 - Present**
*Specialist*:  Dr. Firestone couples his extensive professional research experience with his
training and experience as a forensic engineer to handle complex cases involving the
application of physical science and engineering principles. His cases have ranged from
standard slip/trip and fall, vehicular accidents, product defect, and fire analysis to the effects
of electromagnetic radiation on people. He has had trial experience in both civil and criminal
cases and has testified for civil defendants, plaintiffs, criminal defendants, and the
prosecution. Dr. Firestone has worked for a variety of private law offices, insurance
companies, and government agencies. The latter include: The City of Los Angeles, the City
of Burbank, the City of Torrance, the City of Tacoma, WA, Los Angeles County Public
Defender's Office, Los Angeles County District Attorney's Office, Ventura County Public
Defender's Office, Monterey County Public Defender's Office, State of California Attorney
General's Office, and the State of California Department of Transportation.

*Chief Engineer:* Dr. Firestone was previously the Chief Engineer for the Glendale office. In
addition to his normal duties as a Senior Engineer, Dr. Firestone also had Oversight and
Management responsibility for Engineering activities of the Glendale office.

**JAVCOR -  Santa Barbara, California 1993 - 1995**
*Principal Research Physicist*:  Electromagnetic protection, radar discrimination in a nuclear
disturbed environment, plasma control for fusion and plasma processing.

**Mission Research Corporation - Santa Barbara, California  1986 - 1993**
*Senior Research Scientist*:  Developed analytical models for the hydromagnetic behavior of
intermediate altitude nuclear bursts; atmospheric distribution of nuclear debris; effects of
bursts upon communication, radar, and optical sensing systems. Also developed numerical
nuclear weapons models for system level computer codes. Conceived, obtained funding for
and directed a team which produced the only comprehensive control strategy for fusion grade
plasmas in a tokamak reactor.

**University of California, Los Angeles - Los Angeles, California       1982 - 1986**
*Senior Development Engineer*:  Developed time dependent electromagnetic and power
balance computer code for power producing tokamak reactor. Conceptual development of
ECH tokamak. Analytic physics constraints for the initial start up of a fusion tandem mirror
reactor. Additionally served as a Ph.D. thesis advisor and undergraduate instructor.

**Princeton University Plasma Physics Laboratory - Princeton, N.J. 1977 - 1982**
*Professional Technical Staff:*  Applied modern optimal control theory to plasma position and
current control in tokamaks. Developed a realistic, engineering level computer simulation
code of the plasma-external circuits interaction for analyzing feedback control in TFTR.
Code was also used to study proposed TFTR discharge scenarios and make recommendations

for equipment upgrades and operating procedures. Studied tokamak heating via multi-MeV ion beams.

**OAO Corporation - Beltsville, MD      1976 - 1977**
*Systems Engineer*:  Developed a detailed computer simulation of the NIMBUS satellite's in flight dynamics and control system.

**Computer Sciences Corporation - Silver Spring, MD.      1974 - 1976**
*Mission Analyst:*  Supervision, maneuver planning, and real-time attitude analysis for the Atmospheric Explorer missions. Development and implementation of a novel magnetic attitude control technique.

## EDUCATION
B.S.              *Physics*: The University of Michigan, Ann Arbor - 1967
M.S.              *Physics:* The University of Michigan, Ann Arbor - 1969
Ph.D.      *Physics:* The University of Michigan, Ann Arbor - 1974

von Haenel and Associates, Inc.:  Over 1,000 hours of seminars, workshops, research, and supervised field training in technical application of scientific principals to loss/claim investigation; and expert testimony in advocate forums.

## PROFESSIONAL LICENSES, CERTIFICATIONS AND AFFILIATIONS
American Physical Society
Sigma Xi (Honorary Scientific Society)
New York Academy of Sciences

## PUBLICATIONS
Dr. Firestone has over 30 professional publications in the fields of:
· Controlled thermonuclear fusion reactors;
· Nuclear weapons phenomenology and effects;
· Applications of optimal control theory;
· Satellite dynamics and attitude control; and
· Experimental nuclear physics.



**ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE**
**BUREAU OF INVESTIGATION**                    SA 11-022

## INTERVIEW REPORT

CASE NAME:       CEJA, MARCEL LUIS

CLASSIFICATION:    OFFICER INVOLVED SHOOTING (FATAL)

INTERVIEW OF:     GABRIEL ARREDONDO      DOB: 09-16-1978
                  9261 CIELITO STREET
                  ALTA LOMA, CA. 91701
                  CELL:    626-416-8030

DATE AND TIME:    SEPTEMBER 14, 2012          1334 - 1347 HOURS

LOCATION:        TELEPHONE INTERVIEW

On the above date and time, I conducted an audio digital recorded interview of GABRIEL ARREDONDO regarding the Anaheim police officer involved shooting incident of MARCEL LUIS CEJA. The incident occurred on November 4, 2011, at 2301 East Ball Road, in the city of Anaheim. The following is a summary of the interview:

On November 4, 2011, ARREDONDO was driving east on Ball Road, in the number 2 lane, toward the 57 freeway. The vehicles in front of him began to stop in the roadway. He observed a police officer on the north side of street and talking with three males. The three were standing on the north side of the police car, and it appeared that the officer was directing the three males to place their hands on the police car.

Two of the males, ran north into the apartment complex alley. The other male, later identified as MARCEL CEJA, was wearing a black sweater and ran eastbound. The officer chased CEJA.

| | | | |
|---|---|---|---|
| Investigator:    C. Field # 209 | *C. Field* | Approved By: | *~signature~* |
| Date of Report: September 18, 2012 | | Date:  09/18/12 | **EXHIBIT** 5 |

SA 11-022

ARREDONDO lost sight of CEJA and the officer. He then observed CEJA and the officer running westbound.

ARREDONDO observed CEJA slip on the apartment buildings front lawn and "something shiny came out of one of his hands." ARREDONDO was not sure what CEJA had dropped.

CEJA, now in a seated position on the grass, put his hands up. The police officer stood within a couple of feet from CEJA, and pointed his handgun at CEJA.

The vehicle traffic, in front of ARREDONDO, began to move, so ARREDONDO continued to drive eastbound. ARREDONDO had his windows down and he did not hear any gunshots during his observations. He was approximately five car lanes away from CEJA and the police officer.

Subsequently, ARREDONDO talked with CEJA's father. ARREDONDO was eventually contacted by an attorney representing the CEJA family.

| Investigator: | C. Field # 209 | *C. Field* | Approved By: | |
|---|---|---|---|---|
| Date of Report: September 18, 2012 | | | Date: 09/18/12 | |